PARKER et al. v. ROSS.

(Circuit Court of Appeals, Seventh Circuit. April 18, 1916. Rehearing Denied May 25, 1916.)

No. 2253.

1. APPEAL AND ERROR ☞1022(3)—REVIEW—FINDINGS.

A decree based on the report of the master, who heard the evidence, will not, in case of conflict, be disturbed on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4016; Dec. Dig. ☞1022(3).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. WITNESSES ⬤⟿317(1)—FALSE TESTIMONY.

Where part of the testimony of a witness was obviously false and evasive, the whole testimony, being uncorroborated, may be disregarded.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1080; Dec. Dig. ⬤⟿317(1).]

3. PRINCIPAL AND AGENT ⬤⟿79(5)—FRAUDULENT INTENT—EVIDENCE.

In a suit to set aside a transfer of notes and mortgages, on the ground that defendant, an agent, procured it through his fraud, evidence *held* to show defendant's original fraudulent intent.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 183–185; Dec. Dig. ⬤⟿79(5).]

4. PRINCIPAL AND AGENT ⬤⟿69(3)—DUTY OF AGENT—GOOD FAITH.

It is the duty of an agent, in entering into contracts with his principal, to exercise the utmost good faith.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 134, 135; Dec. Dig. ⬤⟿69(3).]

5. PRINCIPAL AND AGENT ⬤⟿69(3)—TRANSACTIONS—GIFTS.

Where the principal understands the transaction, he may give his entire property to his agent.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 134, 135; Dec. Dig. ⬤⟿69(3).]

6. PRINCIPAL AND AGENT ⬤⟿69(3)—VALIDITY—CONSIDERATION.

Where defendant's principal, who transferred to him her entire property, did so intending that he should make a profit, the inadequacy of the consideration for the conveyance will not warrant its vacation.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 134, 135; Dec. Dig. ⬤⟿69(3).]

7. PRINCIPAL AND AGENT ⬤⟿79(5)—TRANSACTION BETWEEN PARTIES—GOOD FAITH.

The agent of an aged, infirm woman, who occupied towards her a fiduciary relation, has the burden of proving that her conveyance to him of her entire property was free and voluntary, and unless this is established it will be set aside.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 183–185; Dec. Dig. ⬤⟿79(5).]

8. EQUITY ⬤⟿94—NECESSARY PARTIES—BENEFICIARIES.

An aged and infirm woman entered into a contract with her agent, whereby he was to pay her an annuity, and in event of certain contingencies to pay named beneficiaries sums of money after her death. Subsequently the guardian of the aged woman sued to set aside the conveyance, but did not join the beneficiaries as parties. *Held* that, while they were entitled to their day in court and were not represented by the agent, their claim against him being purely personal, they were not necessary parties in the suit to set aside the conveyance, as the agent might be protected by a requirement that sums of money to satisfy any claims the beneficiaries might have against him be deposited in court.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 246, 252; Dec. Dig. ⬤⟿94.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by Edgar W. Ross, as guardian of Mary M. Gray, a feeble-minded person, against Charles W. Parker and another. From a de-

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cree for complainant, defendants appeal. Reversed and remanded, with directions.

Louis E. Hart, of Chicago, Ill., for appellants.
William S. Oppenheim, of Chicago, Ill., for appellee.

Before KOHLSAAT, MACK, and ALSCHULER, Circuit Judges.

MACK, Circuit Judge. The appellee, Edgar W. Ross, as guardian of Mary M. Gray, a feeble-minded person, brought suit against Charles W. Parker and Mary B. Parker for the purpose of disaffirming a contract entered into on February 3, 1911, whereby Mary M. Gray transferred notes and mortgages of the value of some $34,000 to the appellant, Charles W. Parker, in consideration that Parker pay $2,000 in cash to Mrs. Gray and the further sum of $150 a month, commencing March 1, 1911, during her natural life, and also pay to the Rosehill Cemetery Company the sum of $500, to Robert H. Gray, if living one year after Mary's death, $2,000, and to Helen or Leonora Ross, respectively, if then living, $1,000.

A motion to dismiss for failure to join alleged indispensable parties, to wit, the possible beneficiaries under the contract, was overruled. After answer, the cause was referred to a master to take testimony and to report the same, together with his conclusions of law and fact thereon. The master found, as a conclusion from his findings of fact, that "the contract of February 3d was unfair and oppressive as to Mary M. Gray. At the time it was made Charles W. Parker was Mrs. Gray's agent, and as such it was his duty to protect her interests and safeguard the property which he acquired for himself by the terms of the contract for a very inadequate consideration. At the time of the making of the contract Mary M. Gray was nearly 77 years old, feeble physically and mentally. Fiduciary relations existed between her and Charles W. Parker, and had existed for a considerable time prior thereto, growing out of the relation of principal and agent and other relations between them, which gave Parker an undue advantage, and enabled him to procure from her an unconscionable contract"— and as a conclusion of law, that the prayer of the bill should be granted.

All exceptions to the findings of fact and of law were overruled, the master's report was in all respects approved and confirmed, and a decree was entered requiring the defendants to turn over all property and moneys received by them under the contract, directing the clerk of the court to deliver to the plaintiff all securities theretofore received by him from defendants, together with the proceeds therefrom, and awarding a money decree against defendant, Charles W. Parker, for $10,267, the balance due after crediting him with all payments.

[1] 1. The master saw and heard the witnesses. If there were reasonable doubts as to the conclusions of fact to be drawn from their testimony, we should not overrule his findings. A careful examination of the record satisfies us, however, that his findings were in every essential respect sound.

It is unnecessary to rehearse the testimony; it suffices to state that it demonstrates clearly that an old-time friend, with whom the most

trusting and confidential relations had long since been established, took advantage of the newly established fiduciary relation of general business agent in the management of the property of a feeble, 77 year old woman to induce her, without proper, independent advice, to transfer to him her entire property, valued at $34,000, in consideration of $2,000 cash, an annuity that could have been purchased from any responsible insurance company for less than $14,000, and contingent payments aggregating $3,500. At the same time, a former will, under which he was only a partial beneficiary, was revoked, and a new will executed, under which he became sole legatee.

It is true that Parker called in an attorney to his own office to draw the papers. The attorney testified that they had never sustained professional relations, though he had endeavored to sell loans to Parker. He claims to have talked fully with Mrs. Gray as to the plan proposed by her and embodied in the contract, and to have warned her of the danger in the event of Parker's bankruptcy. He further testifies that she told him just what she wanted, and that then Parker came in and expressed a willingness to make such a contract.

But, as the master finds, this old woman, who had never before attempted to transact her own business, had but a month before discharged her former agent, who for years had represented both her and her husband in his lifetime and acted now without consulting any one, surrounded and advised only by Parker, her then agent, an attorney called in by him, and witnesses and notary procured by him. The attorney did not even ask or learn the value of the property to be transferred in consideration of obligations which Parker was to assume; he was not there to give Mrs. Gray independent advice as to the adequacy of the consideration or the wisdom or fairness of the deal which had already been fully arranged with Parker; his warning was limited to the possible result of Parker's insolvency.

[2] Moreover, the master would have been fully justified in completely disregarding the uncorroborated evidence of this witness, in view of his palpably false and evasive testimony respecting his knowledge of his disbarment. He said:

"I quit the practice of law in May, 1913. I took a place with a bank at that time, as manager of the real estate department. That was my only reason for quitting. I have had no notice of disbarment. You will find it a matter of record, if I ever was. I don't know whether I have been disbarred. I think proceedings were brought to disbar me."

[3] 2. The subsequent written statements of Parker confirm his original fraudulent intent. In answer to an inquiry from Ross on January 4, 1914, after his appointment as guardian, Parker purported to give a list of the securities received by him, but he omitted two mortgages, aggregating $11,000, and theretofore assigned by him to his wife, the codefendant. Letters written by him in 1913 contained not only materially false statements, but also insincere assertions of a willingness to let any one have what he received from Mrs. Gray on reimbursement of the moneys paid out by him.

[4-7] 3. The law is clear. Mors v. Peterson, 261 Ill. 532, 104 N. E. 216, and cases cited. Both the confidential relations long existing

between the parties and the specific new relation of agent and principal required Parker to exercise absolute good faith in his dealings with Mrs. Gray, to take no advantage of his position. Of course, a principal may make and an agent accept a gift, a gift even of the entire estate, if the principal clearly understands the transaction. But while the contract recites that Parker's obligations are made "in consideration of absolute gift to me this day of certain real estate mortgages by Mary M. Gray," "gift" is clearly a misnomer. The transaction was a single one; the transfer was made in consideration of the unilateral obligation; it was a sale, not a gift, a business deal.

Mere inadequacy of consideration would not justify an annulment of the transaction. If Mrs. Gray had freely and voluntarily intended to benefit Parker in this substantial manner, she had a perfect right so to do, provided she were then mentally capable of understanding the matter and free from his undue and improper influence. But, in view of the relations of the parties, the burden is on the agent to establish that no undue influence was exerted. This he has completely failed to do. On the contrary, whatever may be said as to her mental condition, the evidence demonstrates that in February, 1911, and thereafter, Mrs. Gray was completely under the strong domination of this defendant, ready to heed his suggestions in every way. Parker's own statements justify the conclusion that he misled her in February, 1911. In October, 1913, he wrote to Ross:

"My transactions with Mrs. Gray have been along pure business lines. Everything has been open and above-board, and I have nothing to hide from you, or any one else who has the right to know. I was talking to my banker, Mr. C. O. Holmes, only yesterday about this matter, and he pronounced it an ideal arrangement for Mrs. Gray; said there was not one man in a thousand who would have done as I did for Mrs. Gray. I did not enter into this transaction with Mrs. Gray with the thought of making money out of her. She was a friend, and I treated her as such. She was not competent to handle her securities to her advantage. John V. Gray did not handle them himself, while living; why should Mrs. Gray attempt doing so? No. A broker would have to be paid for handling the business for her, and his commission would make quite a hole in her income, and at the same time she would have to stand the losses, if there were any, also the expense of foreclosure, etc., etc. You know what that means. It is expensive, and many times one gets a property on their hands that they do not want, and there is bound to be a loss. Mrs. Gray was in no position to handle the business. She brought it to me of her own free will. I never asked her to let me have her business to look after, as this office does not do that kind of business. We collect interest and foreclose mortgages for no one, except upon our own securities in this office. I am a broker, but we handle securities by buying and selling the same. That is our business. This is not a collecting office for other people. Therefore all the securities taken over from Mrs. Gray had to become the property of this office, without any strings upon it. It was all assigned in proper form, and every acknowledgment was witnessed. When the deal was closed, Mrs. Gray was paid a certain amount of money in cash, in the presence of her attorney and our office people. We owned the securities absolutely, and have handled them just as we do any other securities that we own. * * * I am not winding over it. I take my medicine like a man. In the end I hope to clean up a little more than I put into the deal. If any one is laboring under the idea that I have made a bunch of money out of Mrs. Gray, let them come around with the ready cash that I have put into the deal, and they will get all that I have that Mrs. Gray ever owned."

Assuming, however, that the statement of the nature of the transaction is as deliberately false as are the statements of the results of the deal, and that both parties intended, not that Mrs. Gray, but that Parker, should get the financial advantage therefrom, his subsequent concealment and denial of this purpose, coupled with his personal activity in selecting the attorney, the notary, and the witnesses in consummating the deal in his office, fully support the contention that in executing the documents she was fully under his control. In this respect, at least, the case differs from Hunter v. Atkins, 3 Mylne & Keen, 113, and Pressley v. Kemp, 16 S. C. 334, 42 Am. Rep. 635.

[8] 4. The beneficiaries under the contract are entitled to their day in court to contest the claim of invalidity of a contract made partially in their interest. They are not represented by the obligee or her guardian; their interests may be adverse to her contentions. Nor is Parker their trustee. Their claim if any, against him is personal. They have no equitable interest in the property conveyed to him. The relative rights of plaintiff and defendants, however, can be adjudged without them. Any possible claim that they may have against Parker after Mrs. Gray's death can be preserved.

Parker is entitled, on payment over of the property and moneys found due the plaintiff, to be fully indemnified against any possible claim by the beneficiaries. This may be accomplished by permitting the clerk of the District Court to retain in his possession securities of the par value of $3,500, the income thereon to be paid to plaintiff, and a pro rata amount of the principal to be delivered to plaintiff when releases to Parker shall be secured from any of the beneficiaries of any obligation under the contract of February 3, 1911. The District Court will reserve jurisdiction over the cause to enable defendant Parker to apply for reimbursement from this fund on account of any payments that he may make to such beneficiaries pursuant to the terms of the agreement.

The decree is reversed, and cause remanded for such modification of the decree and such further proceedings as shall be in accordance with the views herein expressed. Costs in the District Court and three-fourths of the costs in this court will be borne by appellants.